**In the United States District Court
for the Northern District of Illinois
Eastern Division**

| | |
|---|---|
| Kuiper Ventures LLC, | |
| Plaintiff, | Case No. 25-cv-14406 |
| v. | JURY TRIAL DEMANDED |
| The Individuals, Corporations, Limited Liability Companies, Partnerships, and Unincorporated Associates Identified on Schedule A, | Dist. Judge Sharon Johnson Coleman |
| | Mag. Judge Keri L. Holleb Hotaling |
| Defendants | |

**SUPPLEMENTAL BRIEF ON PROPRIETY OF ELECTRONIC SERVICE**

Plaintiff, Kuiper Ventures LLC, by and through its counsel, Jonathan L.A. Phillips of **Phillips & Bathke, P.C.**, submits the following brief as directed by the Court (Doc. 23).

Jonathan L.A. Phillips (IL6302752)
**Phillips & Bathke, P.C.**
300 Northeast Perry Avenue
Peoria, Illinois 61603
(309) 834-2296
jlap@pb-iplaw.com

**TABLE OF CONTENTS**

I. INTRODUCTION ................................................................................................. 1

II. RELEVANT PRODCEDURAL HISTORY ............................................................ 2

III. ARGUMENT ........................................................................................................ 2

    A. No Transmission Abroad Occurs Through U.S.-based Electronic Accounts .......... 3

    B. The Rules of Civil Procedure Supersede the Convention ....................................... 5

        1. Treaties and statutes are co-equal and the latter enacted governs in a conflict . 5

        2. The Federal Rules possess statutory force within their domain ........................ 5

        3. The Rules, particularly Rule 4(f), are more recent than the 1965 Convention ... 6

    C. Other More Persuasive Authority Reaching the Opposite Conclusion from *Smart Study* Should Be Followed ........................................................................................... 7

        1. Smart Study overextends Volkswagenwerk and Water Splash .......................... 7

        2. The decision in Smart Study has been advanced by defendants in the past, and rejected in a wide variety of situations ..................................................................... 8

        3. The Convention does not carry the exclusivity that Smart Study suggests ......... 9

    D. There Is No Reason To Be Concerned About Overuse of Electronic Service ........ 10

        1. Alternative service requires court approval ...................................................... 10

        2. Plaintiffs desiring an enforceable judgment abroad will use Convention service 11

    E. The Practical Implications of Following *Smart Study* are Devastating ................ 12

        1. Chinese business is inoculated from providing meaningful relief to U.S.-based plaintiffs in all instances under Smart study ........................................................... 12

        2. The Smart Study decision creates perverse incentives ..................................... 13

    F. Email Service is Not a Postal Channel .................................................................. 14

IV. CONCLUSION ................................................................................................... 15

I. **INTRODUCTION**

*Smart Study* is an unpersuasive outlier that should not be followed. The opinion is flawed, most notably for its heavy reliance on dicta from Supreme Court cases that did not address the interplay between Federal Rule of Civil Procedure 4(f)(3) and the Convention, the issue presented in this case. And it ignores contrary appellate authority from the Fifth Circuit, the Federal Circuit, and the Ninth Circuit, the latter of which explicitly held that service under Rule 4(f)(3) is just as valid as service under the Hague Convention. *Rio Properties, Inc. v. Rio Int'l Interlink*, 284 F.3d 1007 (9th Cir. 2002). Finally, a decade and a half of well-reasoned district court decisions, many presented with arguments that are essentially adopted the *Smart Study* opinion have overwhelmingly come to the opposite conclusion as the Second Circuit. Fundamentally, the decision erred by straining to overstate the Convention's exclusivity.

Importantly, the Convention applies only when judicial documents are "transmitted abroad." Here, electronic service to U.S.-based platforms—Amazon messaging accounts, email servers in the United States—involves no transmission abroad. The Convention simply does not apply. And even if it did, the Federal Rules of Civil Procedure, as repeatedly amended by Congress since the Convention's adoption, supersede any conflicting treaty provision under the last-in-time rule.

The practical implications of following *Smart Study* would be devastating. The decision would effectively inoculate Chinese defendants from suit in the United States at the very moment when Chinese counterfeiters account for 80% of the world's counterfeit goods—a $1.7 trillion industry. China has created a system making service there nearly impossible, and the Chinese state "simply refuses to cooperate." *Smart Study*, 2025 WL 3672740. In gutting trial court discretion under Rule 4(f)(3), the

1

Second Circuit makes any case, not just Schedule A cases, impossible if one wants the case *to start* within a year or two. That cannot be.

## II.     RELEVANT PRODCEDURAL HISTORY

This Court directed Plaintiff to submit supplemental briefing addressing the Second Circuit's recent decision in *Smart Study Co., Ltd v. Shenzhenshixindajixieyouxiangongsi*. (Doc. 23) *Smart Study* held that the Hague Convention on Service Abroad of Judicial and Extra Judicial Documents in Civil and Commercial Matters (Nov. 15, 1965) (the **"Convention"**) does not permit electronic service of process to Chinese defendants. No. 24-313, 2025 U.S. App. LEXIS 33039, 2025 WL 3672740 (2d Cir. Dec. 18, 2025). In the Minute Entry, the Court acknowledged that courts in this district have commonly found that email service in Schedule A cases is permissible under the Hague Convention. (Doc. 23).

## III.     ARGUMENT

To begin, this briefing assumes the Court's familiarity with its sister-courts, in this District, repeated findings that electronic service to Chinese ecommerce infringers is appropriate, as stated by the Minute Entry itself. (Doc. 23); *see also Kangol, LLC v. P'ships,* No. 24-cv-01636, U.S. Dist. LEXIS 112901, *5-7 (N.D. Ill. June 13, 2025) (Coleman, J.) (discussing same authority relied on by *Smart Study* and finding the Hague Service Convention does not bar email service). Plaintiff will not retread those.

As threshold issues, there are two reasons that electronic service should be allowed that are outside the scope of what was decided (or argued) at the Second Circuit. First, there is no transmission abroad when a message is sent via the platforms. Second, the more recently and repeatedly amended Rules of Civil Procedure, in particular Rule 4(f)(3) supersede the Convention. Allowing alternative service based on either of these

2

points frees the Court from having to, essentially, resolve a split between the Second, Fifth, Ninth, and Federal Circuits.

Otherwise, the *Smart Study* opinion simply overstates the Convention's exclusivity and its analysis is less persuasive than other opinions reaching the opposite conclusion. This flaw stems from the heavy reliance on dicta from less-than-applicable authority. The implications of applying *Smart Study*, gutting trial court discretion in all cases, not just Schedule A cases, is devastating.

A. <u>No Transmission Abroad Occurs Through U.S.-based Electronic Accounts</u>

Article I of the Convention limits its application to service "abroad." Convention, Art. I; *Volkswagenwerk Aktiengesellschaft v. Schlunk*, 486 U.S. 694 (1988). That territorial limitation is fundamental. If a judicial document is not transmitted abroad, the Convention does not apply. This argument was not advanced at the Second Circuit, but it is outcome dispositive. This independent reason for allowing electronic service avoids the need to reconcile the *Smart Study* decision against other Circuit Court and district court decisions.

*Smart Study* relied on V*olkswagenwerk,* which is instructive here. There, the Supreme Court considered a suit filed against Volkswagen Aktiengesellschaft for a car it allegedly manufactured. *Volkswagenwerk*, 486 U.S. at 696. That company is in Germany. *Id.* at 697. In the Illinois-law-based case about Illinois service of process rules, the plaintiff served Volkswagenwerk through a U.S.-based subsidiary. *Id*. The German company objected, arguing Convention service was necessary.

In ruling on Volkswagenwerk's objection, the Supreme Court noted that Article I concerned transmission of documents abroad. *Id.* at 699. Because Illinois's long-arm statute permitted substitute service on Volkswagenwerk through its U.S.-based

3

subsidiary and that service was not abroad, regardless whether the subsidiary ultimately sent it to Germany, the Convention simply not apply and the inquiry into the Convention ended. *Id.* at 706-08.

In reaching this conclusion, the Supreme Court necessarily rejected the argument that the only way to serve a foreign company was through the Convention. If a company can be served without transmitting documents abroad and that service complies with due process requirements (in both that case and this case, Illinois law), then it is sufficient.

The motion for alternative service in this case focuses on service primarily through ecommerce platforms. That approach is most likely to provide notice and satisfy due process concerns because that is where the Defendants do business. Email is secondary. The primary platform in this case is Temu, which was founded in Boston and has an address at 31 St. James Avenue, Suite 355, Boston, Massachusetts. Contact Us, Temu, https://www.temu.com/contact-us.html.[1] The primary mode of electronic service requested is via the platforms, and that is not service abroad. It is a message sent to a location in the U.S. that a Defendant can retrieve from the U.S. While Plaintiff does not contend platforms are agents for service as Illinois law provided for in *Volkswagenwerk*, that there is nothing transmitted abroad ends the Convention inquiry just as it did there. And as it relates to applicability of Illinois law, the Illinois Supreme Court Rules were amended to allow for service electronically in 2023, squaring up with Rule 4(f)(3) authorization. *See* Ill. Sup. Ct. R. 102.

---

[1] In cases involving Amazon as the platform, it is well known to be founded and located in Seattle, Washington.

B.     The Rules of Civil Procedure Supersede the Convention

There is a second argument not presented to the Second Circuit: whether Rule 4(f)(3) supersedes the Convention when the Convention applies. It does.

1. *Treaties and statutes are co-equal and the latter enacted governs in a conflict*

Treaties and statutes are co-equal under the last-in-time rule. For over a century, it has been black letter law that treaties and statutes share equal domestic status and where there is a conflict, the latter enacted prevails. *Whitney v. Robertson*, 124 U.S. 190, 194-95 (1888). Treaties do not have constitutional superiority over statutes and can be repealed or modified by later congressional acts. *Edye v. Robertson*, 112 U.S. 580, 599 (1884); *The Cherokee Tobacco*, 78 U.S. 616, 621 (1870). This last-in-time rule has been consistently applied in recent decades. *See, e.g., Medellin v. Texas,* 552 U.S. 491, 509 n.5 (2008); *Al-Bihani v. Obama*, 619 F.3d 1, 22 (D.C. Cir. 2010); *see also* 19 U.S.C. § 2504 (providing that no provision of a trade agreement will have effect if it conflicts with a statute).

2. *The Federal Rules possess statutory force within their domain*

The Federal Rules of Civil Procedure have the effect of statutes within their domain and are treated as having the same authority. The Rules Enabling Act governs their creation and status. 28 U.S.C. §§ 2071–2077. Section 2072 grants the Supreme Court power to prescribe general rules of practice and procedure for federal courts, with the explicit limitation that such rules must not affect substantive rights. Once promulgated and effective, these rules supersede any conflicting laws within their procedural domain. 28 U.S.C. § 2072(b). Congress retains power to amend, reject, or delay the effectiveness of any rule. 28 U.S.C. §§ 2072, 2074.

5

The Supreme Court and lower federal courts have consistently recognized that the Federal Rules are promulgated under congressional authority and have binding legal effect in federal courts, provided they comply with the Rules Enabling Act and the Constitution. In *Hanna v. Plumer,* the Court explained that Congress has constitutional power to regulate federal court procedure and that the Federal Rules, when validly adopted, must be applied by federal courts. 380 U.S. 460, 464-65 (1965). The Court, in *Burlington Northern Railroad Co. v. Woods,* emphasized that the rules, once reviewed by Congress and not rejected, have presumptive validity and binding effect. 480 U.S. 1, 6 (1987). Created and derived from congressional power exercised via the Rules Enabling Act, the Federal Rules operate as binding force in federal courts akin to statutes when within that authority. *Platis v. Stockwell*, 630 F.2d 1202 (7th Cir. 1980).

3. *The Rules, particularly Rule 4(f), are more recent than the 1965 Convention*

Recent amendments to the Rules of Civil Procedure are procedural, created under the Rules Enabling Act, and endorsed by Congress. They should be treated as statutes and co-equal to the Convention. Rule 4(f) was added in 1993, replacing a former subdivision (i), making it the last-in-time. Fed. R. Civ. P. 4, Notes of Advisory Committee on Rules—1993 Amendment. Rule 4(f)(3) cannot be completely abrogated by the existence of the Convention as the *Smart Study* decision would require. If applying Rule 4(f)(3)'s allowance of judicial discretion conflicts with the Convention, unless the Convention explicitly prohibits it (as opposed to simply specifically allowing), then judicial discretion prevails. When Congress approved the Federal Rules to allow the "or" in Rule 4(f), it superseded the treaty and allowed judicial discretion unless explicitly prohibited (not simply unlisted) by the Convention.

6

C.  Other More Persuasive Authority Reaching the Opposite Conclusion from *Smart Study* Should Be Followed

*Smart Study* is merely persuasive authority that overstates the Convention's exclusivity. It does not bind this Court any more than the Ninth Circuit did with *Rio Properties, Inc. v. Rio Int'l Interlink*, 284 F.3d 1007 (9th Cir. 2002). The Ninth Circuit determined that Rule 4(f)(3) service is "as favored as service available under Rule 4(f)(1)," which is the Convention portion of service. *Id.* at 1015; *see also Hudson Furniture, Inc. v. Mizrahi,* No. 2022-1290, 2022 U.S. App. LEXIS 31590, at *6-7 (Fed. Cir. 2022) (no requirement to try Convention service before allowing email service); *Viahart, L.L.C. v. GangPeng,* No. 21-40166 (JEF), 2022 U.S. App. LEXIS 3974, at *3 (5th Cir. Feb. 14, 2022) (Convention "does not displace subsection (f)(3)"); It held that the subsections of Rule 4(f) are alternatives without hierarchy. *Id.* As this Court is aware, many sister-courts have reached the same conclusion. This decision is more convincing than the *Smart Study* decision.

1.  *Smart Study overextends Volkswagenwerk and Water Splash*

*Smart Study*'s reliance on Supreme Court authority suffers from two fundamental flaws. First, neither of the cases, *Volkswagenwerk* and *Water Splash*, addressed the interplay between the Convention and Rule 4(f)(3), the issue at hand. Second, *Smart Study* relied on dicta from that authority.

First, *Volkswagenwerk* nor *Water Splash* mentions, let alone addresses the implications of, Rule 4(f). As such, their applicability to the interplay of the Convention and Rule 4(f) is limited. The Second Circuit over-extended the authority in its opinion.

Second, *Smart Study* relies on *Water Splash*'s statement that the Convention specifies certain means of service and preempts inconsistent ones where the Convention

7

applies. *Smart Study Co., Ltd*., 2025 U.S. App. LEXIS at *14-15 (*quoting Water Splash v. Menon*, 581 U.S. 271, 273 (2017)). But, as another district court said about that same language, "It is quintessential dicta." *Patrick's Rest., LLC v. Singh*, No. 18-cv-00764 (ECT/KMM), 2019 U.S. Dist. LEXIS 2535, at *7 (D. Minn. Jan. 7, 2019) (allowing alternative service and rejecting argument based on same portion *Water Splash* relied on by Second Circuit, here).

2. *The decision in Smart Study has been advanced by defendants in the past, and rejected in a wide variety of situations*

The Second Circuit did not tread new when developing its reasoning for refusing email service. It has been brought by defendants before and rejected. *See Id.*; *NBA Props. v. P'ships & Unincorporated Assn's*, 549 F. Supp. 3d 790, 797 (N.D. Ill. 2021) (declining to adopt the interpretation now adopted by the Second Circuit given other cited authority that "the Convention neither authorized nor prohibits service by email"). Even so, the Second Circuit did discount one of the cases relied on in the NBA Properties decision as "clearly misconstrue[ing]" the Convention. *Smart Study Co., Ltd*., 2025 U.S. App. LEXIS at *12 (criticizing *Sulzer Mixpac AG v. Medenstar Indus*., 312 F.R.D. 329, 331–32 (S.D.N.Y. 2015)). But, when criticizing *Sulzer,* the Second Circuit relied in the dicta above and completely ignored the significant support in prior district court opinions.

Courts—Not only in this District, Not only in Schedule A cases, and Not only involving Chinese defendants—have consistently allowed electronic service. Well-reasoned authority has developed, across the country, to allow electronic service against foreign defendants. A California district court allowed electronic service  has been developing for well over a decade As early as 2012, courts have been able to collect cases

8

allowing electronic service as a California district court did, allowing electronic service to Anguilla-, Antigua-, Canada-, Panama-, and Thailand-based defendants. *Facebook, Inc. v. Banana Ads, LLC*, 2012 U.S. Dist. LEXIS 42160, at *11 (N.D. Cal. Mar. 27, 2012) (collecting cases); *see also FTC v. PCCare247 Inc.*, 2013 U.S. Dist. LEXIS 31969 (S.D.N.Y. Mar. 7, 2013) (allowing electronic service to India because no objection to the means and the defendants controlled the email and social media accounts to conduct business). On the other coast, it was "well established" a decade ago that Rule 4(f) does not create a hierarchy of service, as the Second Circuit now tries to do. *WhosHere, Inc. v. Orun*, 2014 U.S. Dist. LEXIS 22084, at *6 (E.D. Va. Mar. 31, 2014) (allowing electronic service to Turkey while collecting cases).

3. *The Convention does not carry the exclusivity that Smart Study suggests*

The Convention contains no exclusivity provision. That it provides a standard way to effect service does not mean there is no other way of effecting service, and it does not claim to be the exclusive means of effectuating service. While relying on *Water Splash,* the Second Circuit missed the key point of the opinion. The Supreme Court pointed out that while a certain means of service, mail, was not "affirmatively authorize[d]" by the Convention, it was still allowed. 581 U.S. at 284. Contradicting this logic, the *Smart Study* opinion suggests that unless email service was specifically authorized by the Convention, it cannot be allowed under Rule 4(f)(3). Not so.

Indeed, the Convention says that if there is a case of urgency, courts can undertake provisional and protective measures. Convention, Art. 15. This is explicitly reference in the Advisory Committee Notes when Rule 4(f) was created, which was pointed out by the Ninth Circuit in *Rio Properties*, further demonstrating its greater

9

persuasive value than Smart Study. 284 F.3d at 1015. Fed. R. Civ. P. 4, Notes of Advisory Committee on Rules—1993 Amendment.

The Second Circuit's opinion in *Smart Study* deserves respect. But it is not binding here, and it is not persuasive. The court relied heavily on dicta from authority that never addressed the interplay between the Federal Rules and the Convention. Three other circuits, the Fifth, Ninth, and Federal, have rejected the conclusion reached. So have many district courts in this District and across the country. Those courts preserve the ability to serve as the Court orders, and their reasoning is sounder.

D.  There Is No Reason To Be Concerned About Overuse of Electronic Service

Even without judicial discretion needing to be considered to secure alternative service, any Plaintiff who wants to enforce its judgment would still have to carefully consider whether electronic service. The Second Circuit's concerns about overuse or end-runs is misplaced.

1. *Alternative service requires court approval*

The *Smart Study* opinion suggests that if email service were allowed, then no one would bother with Convention service. *Smart Study,* 2025 U.S. App. LEXIS at *15. The position discounts the ability of district judges to make informed, reasoned decisions.

Securing the ability to serve service alternatively requires presenting the reasons for the same to a court and securing court approval. Fed. R. Civ. P. 4(f)(3). If unconvinced, the court can refuse: Nothing about alternative service is automatic. Should a Plaintiff be unable to show a court that, given circumstances of the case and the record before it, that alternative service is appropriate, a court can reject it.

For example, if Convention service could occur in weeks, as is often the case in Europe, then plaintiffs may not even want the work of seeking alternative service. And,

10

if they did, a court could reject it, pointing out that there is no need for it under a given record before it.

2. *Plaintiffs desiring an enforceable judgment abroad will use Convention service*

The Supreme Court in *Volkswagenwerk* noted that failing to serve through the Convention was a risk. It might make it harder to enforce a judgment abroad. 486 U.S. at 705. This is precisely why many will use Convention service "outside the scope of its mandatory application." *Id*. at 706. Overblown concerns about ignoring the Convention altogether are misplaced.

The niche nature of Schedule A cases, seems to have led to a contorted application of the law in *Smart Study*. Schedule A cases involve primarily foreign entities selling and importing infringing goods *in the U.S.*, on ecommerce platforms located *in the U.S.*, to consumers located *in the U.S.*, with funds stemming from those sales being *in the U.S.*, in cases brought in courts *in the U.S.* The only non-U.S. element is the purported location of a defendant who is often just a drop-shipping middleman.

If a judgment is secured after alternative, non-Convention, service and there are assets in the U.S., then they can be collected. But if assets are in China or even Portugal or Germany, a plaintiff lacking Convention service might find themselves unable to collect in China, Portugal, or Germany.

This also addresses the Second Circuit's surplusage concern. *Smart Study* submits that the Convention's, allowing two contracting states to create alternative means of service would be rendered superfluous if email service were allowed. *Smart Study,* 2025 U.S. App. LEXIS 33039, at *15-16. Not so. That "side deal" would ensure enforceability of judgment in each country.

11

E. The Practical Implications of Following *Smart Study* are Devastating

*1. Chinese business is inoculated from providing meaningful relief to U.S.-based plaintiffs in all instances under Smart study*

*Smart Study* undermines not only intellectual property protection but the ability for anyone to secure meaningful relief against Chinese-based individuals and companies. The consequences flow far from Schedule A cases.

The Second Circuit acknowledged the difficulty in service and even that the Chinese state "simply refuses to cooperate" with service under the Convention. *Id*. at *4. There are, at a minimum, multi-year "delays" in service. *Id*.

China cannot, or will not, given its reputation for avoiding having its businesses served under the Convention, stop "the most serious counterfeiting problem in the world" where 80% of the world's counterfeits, a $1.7 trillion industry, come from. Chow, *Counterfeiting in the People's Republic of China*, 78 Wash. U.L.Q. 1, 3 (2000); Chow, *Alibaba, Amazon, and Counterfeiting in the Age of the Internet*, 40 Nw. J. Int'l L. & Bus. 157, 167 (2020). Ata minimum, the Second Circuit acknowledged, mirroring concerns of courts in this District, China cannot "effectively regulate" what amounts to "80% of the world's counterfeits." *Smart Study*, 2025 U.S. App. LEXIS 33039, at *19.

Underlying the entirety of the issue is that China is recognized as having built an apparatus that renders Convention service all but meaningless. If China meaningfully participated in the convention, it might not be as "costly" and "slow" as the *Smart Study* court pointed out. There is something perverse straining to reach conclusions to benefit counterfeiters due to a treaty that China has rendered meaningless as it makes nothing simpler, faster, or otherwise facilitates service. And, in doing so, handicap all U.S. plaintiffs from securing relief from Chinese actors.

Stepping back from Schedule A matters, under *Smart Study*, should a Chinese manufacturer of children's products introduce hundreds of thousands of lead-tainted toys into U.S. commerce and families seek remuneration to pay for care necessitated by that exposure to lead, families would face the "Great Legal Wall of China" (*id.*) and not even be able to meaningfully *begin* (let alone advance or settle) the case for years, well after care might be needed. Chinese entities are effectively inoculated against having to provide meaningful relief.

A non-Schedule A intellectual property matter hypothetical might have TikTok infringing on Meta copyrights. Meta may not be able to secure service for years. By then, an entirely different platform might be on top, perhaps because of the damage done to Meta by TikTok and the inability to serve it.

If the Convention was meant to standardize service and make service easier, it has now been weaponized by China to the benefit, here, of patent infringers. There is little reason to strain to find ways to effectively bar U.S. plaintiffs from securing relief for defendants' U.S.-based activities made toward U.S.-based consumers so that U.S.-based assets can be collected against.

2. *The Smart Study decision creates perverse incentives*

Article 1 of the Convention explains that if you do not know the address of a defendant, then it does not apply. A strict requirement requiring Convention service, ignoring the non-hierarchical nature of Rule 4(f) and the ability of district courts to exercise judgment, will encourage halfhearted attempts to learn addresses or entity names in all cases. This is especially the case in some Schedule A cases with hundreds of defendants. This outcome perverts the Convention's purpose and undercuts it, generally.

13

F.   Email Service is Not a Postal Channel

Email is not a postal channel. But more important, a message via Amazon or Temu, the primary alternative service sought here, is neither. Rule 4(f)(3) allows alternative service if it does not violate international law. China has objected to service by post, not email or messages via the very platforms its businesses use to engage in rampant counterfeiting.

The Second Circuit reached the opposite conclusion from dozens, if not hundreds, of other opinions. It did not do so because it equated post and email. Rather, its analysis conflated non-authorization with prohibition, holding that unless a channel is provided for, it is barred. Smart Study, 2025 U.S. App. LEXIS 33039, at *12-14. That analysis essentially rendered any commentary on email and post being the same as dicta. As such, Plaintiff will be brief.

The well-reasoned and oft-cited decision in *Sulzer Mixpac AG v. Medenstar* collects several cases allowing alternative electronic service when there has not been a specific opt-out and is more persuasive. 312 F.R.D. 329, 331-32 (S.D.N.Y. 2015). Dozens of other courts have reached the same conclusion.

Email is not post. It is not physical. It is instant. It is superior when it comes to due process concerns: It travels through the channels by which the entities are doing business; It is much more likely to be seen. Messages by ecommerce platform—again, not sent abroad—even more so. Mail and email/messaging are simply different means of providing notice. Their only similarity is the use of symbols to relay information.

## IV. CONCLUSION

As explained above, and in the previously filed Memorandum In Support of the Motion for Leave to Serve by Alternative Means (Doc. 7), this Court should authorize electronic service via the platforms and email in this case.

Respectfully submitted,
Kuiper Ventures LLC, by

s/ Jonathan L.A. Phillips
Jonathan L.A. Phillips
(IL6302752)
**Phillips & Bathke, P.C.**
300 Northeast Perry Avenue
Peoria, Illinois 61603
(309) 834-2296
jlap@pb-iplaw.com
